We'll now move to the second case on the calendar which is Miller v. New York State Police. Let me just make sure council are here. Ms. Korn, I can see you. Can you hear me? Yes, I can, your honor. Great, you're loud and clear. And then Appalese I think are splitting their time, but we have Mr. Kersonius and Mr. Ginsberg. Mr. Ginsberg. Yes, I can hear and see you. Okay, Mr. Kersonius. I'm here, your honor. I'm sorry. No, that's okay. All right, so Ms. Korn, you've got 10 minutes. You've not sought any rebuttal, so you get the 10 minutes in one swing. And then after that, we'll hear from Mr. Kersonius for three and Mr. Ginsberg for seven. All right, so Ms. Korn, you may proceed. Thank you, your honor. Good morning, your honors. This case presents a question at how we analyze a hostile work environment. And also incredibly important is whether or not when we look at the pervasiveness, the frequency, the hostility, the effect of someone's race for someone in the workplace, what is enough and who gets to decide whether terms such as the any of the 12 discrete acts that were race-based as we've explained in our papers, who gets to decide it? Is it looked at as a whole or is it parsed out and dismissed? Ms. Korn, can I ask you to address the issue of waiver with respect to Mr. Kendall? I mean, it seems from your brief that the only thing you're appealing is to the Title VII hostile work environment claim that pertains to Mr. Kendall, but Title VII doesn't allow for a cause of action against an individual supervisor who's not the employer. And so isn't that a problem? Your honor, I don't think that we have waived that any of the claims against Mr. Kendall, the supervisor, who's key in this case under Section 1983 or Section 1981. We believe those claims- In your appeal, I mean, you only said that you are, I mean, issue two relates to whether or not there was basically a hostile work environment claim based upon race under Title VII. That's what you said. Your honor. And then you said the same thing for issue three, hostile work environment based on race under Title VII. I think when we stated the issues for appeal, we said it was primarily based on the consideration of the hostile work environment claim, but we at no time waived the other claims that we brought. And so that's our position today. And of course, that allows us to go after the individual bad actor as well as the police. And so I understand what your honor is saying, but it is our position that we have never waived them. But you don't say anything about 1981 in your entire brief. Actually, we are analyzing the claims against the individual and we have never waived that. And the only way we could talk about that is if we believed and we alleged that we still have the 1983 and 1981 claims. So, and in our identification of issues, we say it's primarily based on Title VII, but we did not waive the individual liability. Focusing briefly on just on your claim against the state, state police, tell me why the Farragher-Ellerth defense is not operative here. We had a system in place to address claims. Indeed, Miller presented his claim eventually in 2013 to this following this procedure. So he was aware of it. Obviously they'd made him aware of anyway to virtual certainty and he knew about it. And then he didn't avail himself prior to that of this. So why aren't the claims that precede the one that he, the claims that he made, why aren't they barred by Farragher-Ellerth as in furtherance of the defense? If you look at this case in the totality of the circumstances, the plaintiff was complaining to his supervisor after almost every incident. That counts. The vicarious liability, which is part of how you hold the employer strictly liable, applies because Kendall was the supervisor. He's also the harasser, the alleged harasser. So you say that you can overcome the Farragher-Ellerth affirmative defense by just complaining, if you're harassed as a supervisor, by just complaining to that, to the person who's harassing you. How does that actually effectuate in practical terms? I'm not talking about this case, but in practical terms, how does that actually trigger the use of the procedures that have been set up by the state police to safeguard against claims like this? Your Honor, in complaining about a hostile work environment based on race, you're supposed to go to the first person who is your supervisor and that's always the choice. And you can stop there. You can stop there. Actually, if the supervisor says, you know, I don't want to hear anything more about this, that's the end of it. They're not allowed to end it there, Your Honor, because they are a supervisor, they have to report it on up the chain or to human resources. They have that obligation. There was no prevention and that is why they absolutely cannot take advantage. What evidence is there that when he spoke to his supervisor, and I think there's a debate over whether there were complaints or whether they were discussions, but in any event, let's assume that there were complaints. Did he ever tell the supervisor, I want to invoke the company's procedures for grievances so that you, you know, so that it'll be handled through the company's grievance procedure? Your Honor, that is not something that is required of a plaintiff. They need to complain about the protected class, that being race, and Miller did that over and over again, if you read the brief. That is just the one complaint should have invoked an investigation and, and Mr. Kendall had the, the obligation because he was a supervisor to follow the policies of the state police. There was no attempt to prevent or correct, forget promptly, the racism, the systemic racism that eventually caused the plaintiff to be so depressed and so Mr. Miller's claims. I'm talking about the Farragher-Ellerith defense. Yes. And you say it's satisfied by simply complaining to the harasser. Yes, Your Honor. Yes, Your Honor. What, what's your, what's your best case for that proposition? That is Farragher-Ellerith, the Supreme Court, actually the Supreme Court trio, Burlington-Ellerith, um, uh, Farragher-Ellerith, the Burlington case, um, and actually on Colley as well, those three cases, uh, were the trio Supreme Court that really... I know those cases, I'm not sure how that proposition that, that voicing the concern to the, uh, the supervisor, who also happens to be the violator. Yeah, Your Honor, they set forth... The first is sufficient. Your Honor, they set forth the distinction between the responsibility of somebody who is supervisory authority and how that vicariously makes the employer liable just because of the, the, uh, managerial or supervisory status. I don't think anyone's questioning the fact of liability, uh, for, for the company when there's this kind of harassment. The issue is whether or not the was below, right? Well, Kendall being the supervisor, having not passed the complaint up so that it would be investigated, any of the complaints, the ones that he made verbally or the, finally, the internal complaint, that's a problem for the defense. That goes against the standard, but as far as the Farragher... I'm sorry, Counselor, I thought the internal complaint was investigated. It was, but there were complaints that were verbal way before that internal complaint that also count and they count under the Farragher-Ellerith, uh, ruling. You have to prevent and correct promptly any indicia of, of, of a hostile work environment in this case based on race. But it sounds like, I'm sorry, it sounds like the way that you're is to encourage employers to have systems in place for addressing these kinds of problems. And so if these verbal complaints are not making it through the official process because of the fact that the person that the complaints are being, the person who the complaints are being made to is in fact the, the, you know, the transgressor, it seems as if that just undermines what the whole purpose of this defense is. Because if their complaint isn't, if the system, is not being used and, and you're saying, well, it didn't happen, you know, he complained to the, the supervisor. Well, the supervisor was the one who was allegedly harassing. And so I, I just, it seems like to say that you don't have to use or, or, uh, access the company's process when that's what the defense is about, encouraging employers to have something in place to address this. Um, Your Honor, you are precisely correct. And the process puts the onus, uh, on certainly on the, uh, employee to complain, but the onus, if you look at the case law is on the supervisor to then follow the policies. Even in the context where the supervisor is the alleged transgressor and the person who's making complaint has not actually asked them to do more or pass on their complaints or anything of that sort. It's strict liability. They needed to do their job and stop discrimination. Let's hypothetically just imagine a situation where, um, there's harassment going on or there's illegal activity going on in terms of, of, of racial epithets and, um, and abuse to an employee by a supervisor. Uh, and the supervisor just, uh, takes the position all along that these are not really, uh, this isn't, you know, I don't see he's, he's, he's upset, but he's not complaining. He's not taking it up to anybody. He's not telling me to take it up to anybody. Uh, and, um, and so this, this, this dispute just festers, uh, and, and, and they have a system in place to deal with this kind of thing. If a complaint is properly presented to it, but there's no reason for the harasser who has a different mindset about this for the harasser to think that, uh, the harasser is acting inappropriately or that it's amounted to a hostile work environment. Maybe he takes the position that these are isolated events. Maybe he takes that position incorrectly that these are isolated events. How, how has the, how has the defense supposed to work under these circumstances? How's, how's the policy of the company supposed to work and how, why is the defense worth anything under those circumstances? Under the, uh, Farragher-Ellerith defense, there has to be some correction and prompt correction under the way the, the Farragher-Ellerith, uh, defense, it requires supervisors. If there's a have to pass it up the chain, Mr. Miller did, uh, make an internal complaint after making direct complaints to his supervisor in order to have the advantage of the defense. They needed to act promptly and they needed to correct. They never did. Um, unless there are other questions, uh, I think you're over, but we'll now hear from the appellees. Mr. Personius, you're going first for three minutes. Is that correct? Mr. Personius. Yeah, I'm, I'm trying your honor. I'm sorry. Okay. I can't get the, we can see you. Great. Okay. All right. I apologize. May it, may it please the court. Uh, we agree, uh, your honor, uh, judge Sullivan with your question about whether or not the issues in this appeal as they relate to, uh, Mr. Kendall have been waived. Uh, we point that out in our brief on page four of appellants brief under issues presented issue two, uh, categorically indicates, uh, that the appeal, uh, involves a claim pursuant to title seven. And the same is true in issue three, it frames the issue in terms of liability under title seven. And as the court has noted, title seven is not applicable in this case to Mr. Kendall. So the primary argument, uh, uh, we take the position that the appeal as it relates to him has been waived. Well, I mean, it's not just that we are clear about that. I mean, the court below is very clear on that point, right? Well, the low judge in, in the sixth cause of action in the amended complaint, an allegation had been made under title seven. It was dismissed by the court because it found it to be insufficient. And that was not made a part of this appeal. So, so that dismissal of amended complaint count six was not appealed by Mr. Miller. Uh, beyond that, um, it's, it's our view, um, that, that under the appropriate precedent and, and in particular under little and, uh, uh, from this court and under Harris from the Supreme court, as well as the Schwab decision from this court, that the language that is used, uh, by which a hostile work environment claim is to be evaluated, uh, indicates that there's a weighty standard that has to be made or satisfied by the claimant and little John, it talks about a working environment that was with discriminatory intimidation, ridicule, and insult. It goes on to say that it has to be severe or pervasive enough to both alter the conditions of employment and create an abusive working environment. And the Schwab case, this court noted that there has to be what, what the appropriate racial comments. I had to look up appropriate and it's, it's a very strong word. And I understand it to mean scornful. And, and in this case, there is no evidence there there's these allegations by, by appellant, but there's no evidence that the work environment was permeated with intimidation, that it was permeated with ridicule or that it was permeated with insult. The appellant acknowledges that none of these alleged statements were in any way directed at him. There's no claim he was ever subject to name calling. Uh, so, so on that basis alone, let me ask you this, isn't it possible that an argument could be made that, uh, because of the, uh, discussions that occurred in earlier before the, before the period in question, I'm talking about in the nineties, uh, that, uh, the, um, uh, that the plaintiff here was, was very sensitive to the, to the use of the N word, uh, and, and that it upset him terribly, uh, and that it was wrong under virtually every set of circumstances and that, uh, therefore, um, uh, and, and it didn't, it was just whether anybody used it. It wasn't whether it was directed at him as an African-American. It was whether anybody used it at all. It was just upsetting to him. And then from that point on, uh, Mr. Kendall was aware of that fact. And so made sure that he didn't direct any, any, uh, uh, the use of the word to, uh, the plate to Miller, but in fact, kept repeating situations that use the word in a way that got that, that he knew would bother Miller would upset him, make life miserable for him, et cetera, uh, because of his sensitivity of which he was aware because of the earlier conversation. Couldn't an argument be made on that score because I don't think it necessarily requires that the, um, a program or the language used be directed at the, at the, uh, uh, at the plaintiff directly if it's, if it's surrounding him, uh, in, in, in, in other ways. Judge, I agree with, with the fact that doesn't have to be directed to be actionable, but it's certainly a factor to be taken into consideration. The alleged instances in this case, when the N word was used, uh, by Mr. Kendall five, it was a total of five times over seven years that he supervised the, the appellant one involved in undercover Facebook reference. And it was clear that the reason the N word was being used in that instance was to continue to authenticate, uh, that Facebook page, which was being used in an undercover fashion. There was another instance in the course of an investigation. When Mr. Kendall referred to a statement by a witness that the fugitive was a smart N word who would never be caught. And the indicates in the record that the discussion that followed had nothing to do with, with that racial epithet. It had everything to do with the intelligence of this individual and whether or not he would ever be caught. That's what Mr. Kendall was concerned with. And that's what appellant understood that he was referring to. And beyond that, it was in the context of an investigation. All there is beyond that in the record are a claim by, or is a claim by the appellant that on three occasions, Mr. Kendall repeated another witness statement about a fugitive. And the fact the witness said I haven't, or I ain't seen that N word in a minute, three times on two of those occasions, appellant acknowledges he said and did nothing. And the third occasion, all that he did was to shake his head and walk away. And, we respectfully take issue with the broad statement by Ms. Korn that the appellant in this case complained to Mr. Kendall. It's just not supported by the record. By our count of these incidents that are referred to, there were only four instances when there was any kind of reaction, any kind of reaction at all by the appellant. And the one is the one I talked about the one time that the, I haven't seen, or I ain't seen that N word in a minute, where the appellant said he shook his head and walked away. The other two times he did nothing. When the video that's called the Sweet Brown's Cold Pop Escape was played, and Mr. Kendall repeated a phrase from that video, the only thing that was said by the appellant was, it's not funny. Although he later admitted that he could see how Kendall could have found it to be funny because the video was such a viral sensation. Then there was the Facebook posting, which we've already talked about. And as to that, the appellant claims he shook his head, said, not cool, and walked away. And then the, the only other instance is when Mr. Kendall was reading a newspaper about a shooting in a restaurant in Buffalo called the City Grill. And it indicated in the news article that all the victims had criminal records. And Mr. Kendall made the remark that the victims were animals. And in that instance, the only thing that the appellant said was, why would you call them animals? So to say that there was ever a complaint, and I'm happy to respond to anything else in the record that could be construed as a complaint by the appellant, and it just isn't there. And you can't just make a conclusory claim and say that the appellant repeatedly complained to Mr. Kendall when the record simply doesn't support it. And for these reasons, Judge Walker and Judge Sullivan and Judge Lee, we ask that the decision by the district court be affirmed. So it's your position that your adversary's claim that he was complaining to Kendall as the supervisor throughout, those weren't real complaints that he was making. And therefore, the Farragher-Ellworth defense is viable here. Well, it would be. That doesn't apply to us, and I'm happy to help my co-counsel. But it's not in the record. You can't just say it as you know, and that makes it true. It isn't there. All right. Thank you very much. We'll now hear from Mr. Ginsburg for seven minutes. May it please the court. However a jury might view Mr. Kendall's conduct, summary judgment was appropriate for the state on the Title VII claim because the New York State Police established Farragher-Ellworth defense. The record establishes that plaintiff failed to promptly invoke the police's internal complaint procedure and thereby deprive the employer of notice of Kendall's in the bud. Now as to when these complaints were made, I know there was some discussion with my, excuse me, colleague, Mr. Personius on that. I think the clearest statement is in Mr. Miller's deposition at page 904 of the appendix, where he says that the filing of this internal complaint was, quote, he's saying yes to a question posed to him so that the word you is in here, was, quote, the first time you ever complained to anyone at the state police about what you perceived as senior investigator Kendall's racist behavior. He answers that question yes. In terms of whether Kendall, and if the court is interested in the legal issue of whether under Farragher-Ellworth Kendall had a duty to report upwards based upon these earlier discussions, I mean we'd be happy to brief that. That wasn't one of the objections to Farragher-Ellworth raised in the appellant's brief, so it's not something that the state has spent a lot of time thinking about. We basically took Miller at his word in his deposition that the internal complaint was the, in July 2013, was the first time invoking that state's process. And the, he really doesn't give any explanations in his brief to this court as to why he delayed so long. He advanced two explanations in the district court though, and neither of them is sufficient. The first explanation is that he waited until, quote, the straw that broke the camel's back in terms of the accumulation of Mr. Kendall's conduct, but the plaintiff is not entitled to wait until that point. The objective of and nip it in the bud. In fact, Ellworth itself said that the purpose of this defense is to encourage reporting of improper conduct, quote, before it becomes severe or pervasive. And that's why the Supreme Court has found it unfair to hold the employer liable where the employer was given no such notice and the opportunity to intervene. So in that way, Farragher-Ellworth is not, for which is designed to ensure that an agency gets the ability to completely assess a full ripened claim before judicial review of that claim. Farragher-Ellworth is about the interdiction of this improper behavior in real time. The second explanation that plaintiff gives that, or that he gave in the district court for why he didn't invoke the police procedures until July of 2013, three years after the first complaint or after the first alleged incident was that plaintiff had a fear of accusing a white supervisor, a plaintiff as a black individual had a fear of accusing a white supervisor within the police system. And this court has held that that's not enough. I think the best case is the Leopold case from 2001 that held that this sort of generalized fear of retaliation is insufficient. And the best quote is from that case, evidence must be produced to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints in order for this sort of fear of retaliation to justify delay under Farragher-Ellworth. And there was no such evidence here. So for all those reasons, regardless of what a jury might think about Kendall's conduct in the first instance, Farragher-Ellworth applies. I'm happy to take any questions on the ADA claim. We think that's waived. Plaintiff did not mention the ADA claim in his objections to the magistrate judges R&R and he did not explain that failure to do so in his brief to this court and didn't mention anything about it in the opening oral presentation and there's no time reserved for rebuttal. So I guess that's it. So we think that claim that this court need not even, should not even review that claim. And if there are no questions as to the merits of the ADA claim or anything else, the state will rest and ask that summary judgment in the state's favor be affirmed. We will reserve decision. Thank you all.